IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. | ) | |
| ANA SANCHEZ-SMITH, | ) | |
| AMBER HAVERFIELD-CHATWELL, | ) | |
| and DANA WHITE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 05-CV-442-TCK-PJC |
| | ) | |
| AHS TULSA REGIONAL MEDICAL | ) | |
| CENTER, LLC, d/b/a TULSA REGIONAL | ) | |
| MEDICAL CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Ana Sanchez-Smith ("Smith"), Amber Haverfield-Chatwell ("Chatwell"), and Dana White

("White") (collectively "Relators") filed this qui tam action on behalf of the United States of America

pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*[1] Relators assert that Defendant

AHS Tulsa Regional Medical Center, LLC d/b/a Tulsa Regional Medical Center ("TRMC")

submitted numerous false claims for inpatient psychiatric services provided in its Children and

Adolescent Behavioral Health Unit ("Unit") during 2003-2005, in violation of 31 U.S.C. § 3729(a)(1)

and (2).[2] Before the Court is Defendant's Motion for Summary Judgment (Docs. 230, 244), wherein

---

[1] The FCA authorizes private citizens to assert FCA claims on behalf of the United States. 31 U.S.C. § 3730(b). These actions are known as qui tam actions, with the private citizen or "relator" acting "for the person and for the U.S. government against the alleged false claimant." *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 706 n.3 (10th Cir. 2006) (quotation omitted).

[2] On May 20, 2009, Congress enacted the Fraud Enforcement Recovery Act of 2009 ("FERA"), which amended these sections of the FCA. *See* 123 Stat. 1617. However, the FERA provides that "the amendment made by this section . . . shall apply to conduct on or after the date of enactment, except that [the amendments to § 3729(a)(2)] shall take effect as if enacted on June 7, 2008, and apply to all claims . . . that are pending on or after that date." 123 Stat. at 1625. In this

TRMC contends that it is entitled to judgment as a matter of law based on Relators' failure to demonstrate the submission of any false claims. For reasons explained below, the motion is denied.

## I.      Procedural History

Relators, all of whom were TRMC employees in the Unit at relevant times, filed their Complaint on August 3, 2005, alleging six practices by TRMC that resulted in the submission of false claims, including: (1) fraudulently concealing missing signatures from patients' charts and failing to actually obtain patient signatures on individual care plans; (2) placing unlicensed individuals in charge of group therapy sessions; (3) allowing unlicensed individuals to draft individual care plans; (4) failing to meet therapeutic recreation treatment requirements; (5) misrepresenting the length of therapy sessions; and (6) allowing mental health professionals to sign blank individual care plans, to be filled in later by an unlicensed individual. Relators alleged to have either witnessed or directly participated in these practices. Relators alleged that TRMC, by and through managers in the Unit, knew that such conduct violated Medicaid regulations and submitted false claims in order to wrongfully gain profits. On May 14, 2007, the United States notified the Court that it would not intervene in the action, and Relators proceeded to serve their Complaint on TRMC. *See* 31 U.S.C. § 3730(b)(2) (providing that United States must be given opportunity to intervene before relators may serve complaint on defendant).

On September 10, 2007, Defendant filed a motion to dismiss. On January 29, 2008, over Relators' objection, the Court stayed discovery pending ruling on the motion to dismiss. On April

---

case, all relevant conduct took place before the amendment, and all claims were submitted and paid well before June 7, 2008. Therefore, the former version governs, *see Boone v. Mountainmade Found.*, 684 F. Supp. 2d 1, 8, n.7 (D.D.C. 2010) (reaching same conclusion), and all citations are to the former version.

8, 2008, the Court denied the motion to dismiss and held that Relators' allegations were sufficient to satisfy Federal Rules of Civil Procedure 9(b) and 12(b)(6).  (*See* Doc. 57.)  During the course of discovery, which proceeded over two years, Magistrate Judge Paul Cleary entered an Agreed Protective Order governing confidential information (*see* Doc. 73) and resolved numerous discovery disputes (*see, e.g.*, Docs. 126, 258, 294, 295, and 296).  Most significantly, Judge Cleary denied Relators' motion to compel discovery of patient records where (1) the patient's treatment was covered by the Alcohol, Drug Abuse and Mental Health Act ("ADAMHA"), 42 U.S.C. § 290dd-2, and (2) the patient did not consent to disclosure.  (*See* Doc. 200.)  This Court affirmed such ruling (*see* Doc. 238), resulting in Relators' inability to discover records of certain patients identified in Relators' Amended Complaint.  On June 23, 2010, TRMC filed the motion for summary judgment currently pending.

## II.    Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006).  The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party.  *Id.*  However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The party seeking to overcome a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986).

### III.    Relevant Federal and State Regulations

In order to participate in the Medicare/Medicaid programs, a hospital such as TRMC must satisfy certain conditions established by federal regulations.  *See* 42 C.F.R. §§ 482.1, *et seq.* (entitled "Conditions of Participation for Hospitals").  There are "[s]pecial provisions applying to psychiatric hospitals."  *See id.* § 482.60(a)-(d).  It is not disputed that, at all relevant times, TRMC satisfied these federal "conditions of participation" in the Medicare/Medicaid programs and was licensed by the State of Oklahoma to provide psychiatric services in the Unit.  In addition to the "conditions of participation," there are other requirements set forth in federal regulations applicable to inpatient psychiatric services for minors.  Specifically, federal regulations contain the following "active treatment" requirements:

> Inpatient psychiatric services must involve "active treatment", which means implementation of a professionally developed and supervised individual plan of care, described in § 441.155 that is--
> (a) Developed and implemented no later than 14 days after admission; and
> (b) Designed to achieve the recipient's discharge from inpatient status at the earliest possible time.

42 C.F.R. § 441.154.[3]

The Oklahoma Health Care Authority ("OHCA") is the state agency that administers the Oklahoma Medicaid program.  *See* Okla. Stat. 63, § 5009(B).  OHCA has promulgated additional regulations governing inpatient psychiatric services for minors.  During 2003-2005,[4] the regulations relevant to this case were set forth at § 317:30-5-95.2 of the Oklahoma Administrative Code (entitled

---

[3] In this case, there are no allegations that TRMC failed to comply with 42 C.F.R. § 441.154 or any other federal regulations.

[4] Certain Oklahoma regulations discussed in this Opinion and Order have been amended or revoked.  The parties do not dispute that the relevant regulations were those in place between 2003-2005, attached as Exhibit 6 to Defendant's Motion for Summary Judgment.

"Coverage for children") and § 317:30-5-96 of the Oklahoma Administrative Code (entitled "Reimbursement for inpatient services").[5] Understanding the nature and purpose of these Oklahoma regulations is necessary in this case, and they are explained in detail below.

A.    Coverage for Children - § 317:30-5-95.2

The "Coverage for children" regulation applies to "coverage for inpatient services for persons under age 21 in acute care hospitals, freestanding psychiatric hospitals and residential psychiatric treatment facilities."   It contains six subparts: (1) "Pre-authorization of inpatient psychiatric services," which requires that all inpatient psychiatric services "must be prior authorized by an agent designated by the OHCA," Okla. Admin. Code § 317:30-5-95.2(1); (2) "Inpatient services," which, in relevant part, sets forth the medical necessity criteria for "acute" psychiatric admissions and "residential" psychiatric admissions, *see id.* § 317:30-5-95.2(2)(B),(F);[6] (3) "Pre-authorization and extension procedures," § 317:30-5-95.2(3); (4) "Quality of care requirements," which include admission requirements, plan of care requirements, *active treatment requirements*,[7] credentialing requirements, treatment team requirements, evaluation requirements, nursing services requirements, reporting requirements, and a requirement to abide by other official standards, *see id.* § 317:30-5-95.2(4)(A)-(I) (emphasis added); (5) "Documentation of records," which requires that all services

---

[5]  Title 317 of the Oklahoma Administrative Code is entitled "Oklahoma Health Care Authority"; Chapter 30 is entitled "Medical Providers - Fee for Service"; Subchapter 5 is entitled "Individual Providers and Specialties"; and Part 6 is entitled "Inpatient Psychiatric Hospitals."

[6]  There are different "medical necessity criteria" for admission as an "acute" psychiatric patient and  admission as a "residential" psychiatric patient.  *Compare id.* § 317:30-5-95.2(2)(B) *with* § 317:30-5-95.2(2)(F).  For example, to be admitted as an acute patient, the individual must have "[w]ithin the past 48 hours" presented an "imminent life threatening emergency."  *See id.* § 317:30-5-95.2(2)(B).

[7]  Relators allege TRMC knowingly violated the active treatment requirements.

provided under active treatment be documented in a particular manner, *see id.* § 317:30-5-95.2(5); and (6) "Inspection of care," which sets up a scheme governing "Inspection of Care Reviews" of Oklahoma psychiatric facilities receiving Medicaid payments. Of these six subparts, two are particularly relevant to the issues presented, the "Quality of care" subpart and the "Inspection of care" subpart.

### 1.   Quality of Care - Active Treatment Requirements

Listed as one "quality of care" requirement is that "[i]npatient psychiatric programs must provide "Active Treatment." Relevant to this case, the regulations provide:

> The following components *meet the minimum standards* required for "Active Treatment", although an individual child's needs for treatment may exceed this minimum standard:
> . . .
> (ii) Individual therapy. . . . Individual therapy must be provided two hours per week in acute care and one hour per week in residential treatment by a mental health professional as described in OAC 317:30-5-240(c). One hour of family therapy may be substituted for one hour of individual therapy at the treatment teams [sic] discretion.
> (iii) Family therapy. . . . Family therapy must be provided one hour per week for acute care and residential treatment. One hour of individual therapy addressing relevant family issues may be substituted for a family session in an instance in which the family is unable to attend a scheduled session . . .
> (iv) Process group therapy. . . . Group therapy must be provided three hours per week in acute care and two hours per week in residential treatment . . . . In lieu of one hour of process group therapy, one hour of expressive group therapy may be substituted.
> (v) Expressive group therapy. . . . Expressive group therapy must be provided four hours per week in acute care and three hours per week in residential treatment. In lieu of one hour of expressive group therapy, one hour of process group therapy may be substituted.
> (vi) Group rehabilitative treatment. Group rehabilitative treatment services will be provided two hours each day for all inpatient psychiatric care. In lieu of two hours of group rehabilitative services per day, one hour of individual rehabilitative services per day may be substituted.
> . . .

6

Okla. Admin. Code § 317:30-5-95.2(4)(C) (emphasis added) (hereinafter referred to as "active treatment requirements").[8] As explained in more detail below, the active treatment regulations result in "minimum" requirements of 21 hours of total weekly therapy for residential patients and 24 hours of total weekly therapy for acute patients. In addition, individual, family, and process group therapy must be provided by a mental health professional. *See id.*[9]

        2.    <u>Inspection of Care</u>

This subpart sets up the regulatory scheme governing inspections of facilities receiving Medicaid funds:

> (A) There will be an on site inspection of care of each psychiatric facility that provides care to recipients which will be performed by the OHCA or its designated agent. The Oklahoma Health Care Authority will designate the members of the Inspection of Care team. . . . The Inspection of Care Review will consist of recipients present or listed as facility residents at the beginning of the Inspection of Care visit *as well as recipients on which claims have been filed with OHCA for acute or [residential] levels of care. The review includes validation of certain factors, all of which must be met for the Medicaid Services to be compensable.* Following the on-site inspection, the Inspection of Care Team will report its findings to the facility. *The facility will be provided with written notification if the findings of the inspection of care have resulted in any deficiencies. Deficiencies may result in a monetary penalty, (partial per-diem) or a total (full per-diem) recoupment of the compensation received. If the review findings have resulted in a penalty status, a penalty (partial per-diem) of $50.00 per event and the days of service involved will be reported in the notification. If the review findings have resulted in full (full per-diem) recoupment status, the non-compensable days of services will be reported in the notification. In*

---

[8]  These active treatment requirements are in addition to the federal active treatment requirements set forth in 42 C.F.R. § 441.154. When the Court refers generally to active treatment requirements, the Court is referring to those set forth in Oklahoma regulations.

[9]  The regulations also set forth certain qualitative standards, such as individual therapy being "goal-directed utilizing techniques appropriate to the individual patient's plan of care and developmental and cognitive abilities." Okla. Admin. Code § 317:30-5-95.2(4)(C)(ii). It appears that only the quantitative minimums and mental health professional requirements are at issue in this case.

*the case of non-compensable days (full per-diem) or penalties (partial per-diem) the facility will be required to refund the amount.*

(B) *Penalties or non-compensable days which are the result of the facility's failure to appropriately provide and document the services described herein . . .* and/or state licensing standards, *are not Medicaid compensable* or billable to the patient or the patient's family.

(C) If a denial decision is made, a reconsideration request may be made directly to the OHCA designated agent within 10 working days of notification of the denial. The agent will return a decision within 10 working days from the time of receiving the reconsideration request. If the denial decision is upheld, the denial can be appealed to the Oklahoma Health Care Authority within 20 working days of notification of the denial by the OHCA designated agent.

Okla. Admin. Code § 317:30-5-95.2(6) (emphasis added).

In sum, this regulation authorizes OHCA to (1) conduct what is essentially an audit of the facility, (2) determine if there are "deficiencies" in the facility's provision of care to particular Medicaid patients for which claims were submitted, and (3) assess a $50.00 "partial per diem" penalty for certain days of billed service or assess a "full per diem" recoupment for certain days of billed service. Therefore, a facility's failure to comply with the requirements set forth in § 317:30-5-95.2(1)-(5) – including the quality of care requirements – may, at the discretion of the Inspection of Care Team, result in the facility being forced to refund Medicaid funds. Because inpatient psychiatric services are reimbursed by Medicaid based on a "per diem" rate, *see infra* Part II.B, the refunds are also on a per diem basis. In other words, the facility must refund either a flat $50.00 rate (in the case of a partial per diem penalty) or must refund the total per diem rate (in the case of a full per diem recoupment).

8

B.      Reimbursement for inpatient services- § 317:30-5-96

A separate regulation explains how facilities are reimbursed by Oklahoma Medicaid for

inpatient psychiatric services they provide:

> (a)  Reimbursement for inpatient hospital services.  Reimbursement for inpatient
> hospital services *is made based on a prospective per diem level of care payment
> system.  The per diem includes all non-physician services furnished either directly or
> under arrangements.* . . . .
> (1)  Components.  There are three distinct payment components under this system.
> Total per diem reimbursement under the new reimbursement system will equal the
> sum of two rate components:
> (A) Level of care per diem; plus
> (B) Fixed capital per diem.
> (2)  Level of care per diem rates.  *The level of care per diem rate is payment for
> operating costs* and movable capital costs. . . .
> (A)  Level of care.  *The only level of care is psychiatric care (Level 6).*  The range of
> primary diagnosis codes is 290 through 316.
> . . .

*Id.* § 317:30-5-96 (emphasis added).  Thus, facilities bill Oklahoma Medicaid on a "prospective per

diem level of care payment system."  The per diem rate includes "all non-physician services."  It is

not disputed that costs of therapy performed by mental health professionals is a "non-physician"

service that is an operating cost included within the per diem rate.  As to the "level of care," the

regulation provides that the only "level of care" is "Level 6" for psychiatric care, indicating that only

a "6" level of care would appear on a Medicaid bill submitted under this provision.

## IV.    Factual Background

The following facts are either undisputed facts or facts construed in a light most favorable to

Relators.

A.      Agreements Between TRMC and OHCA

On March 11, 2004, OHCA entered into an agreement with "Hillcrest Riverside d/b/a Tulsa Regional Medical Center" for the purpose of allowing TRMC to "submit invoices for the services provided under the Medicaid program without the necessity of certifying the contents of a statement before a notary public on each separate invoice." (Ex. 2 to Pls.' Resp. to Def.'s Mot. for Summ. J.) In this agreement, TRMC was issued "provider number" 100700560A. On the same date, OHCA entered into an identical agreement with "Hillcrest Riverside, Inc. d/b/a Children's Medical Center" ("CMC"). In this agreement, CMC was issued "provider number" 100728750B. TRMC utilized provider number 100700560A when it billed for patients classified as "acute," and CMC utilized provider number 100728750B when it billed for patients classified as "residential."[10] Oklahoma Medicaid paid different per diem rates depending on the acute or residential classification, with the acute rate being higher. These two contracts, hereinafter referred to as the "Agreements," are indicative of agreements in place at all relevant times from 2003-2005.[11]

---

[10] For purposes of this motion, it is not disputed that Defendant TRMC is liable for any false claims submitted by CMC.

[11] Despite Relators' classification of these contracts as the "Acute Care Contract" and the "Residential Care Contract," (*see* Pls.' Resp. to Def.'s Mot. for Summ. J. at Additional Statement of Fact 6), the Court has located no difference between the two contracts that would indicate that one governed "acute" care and the other governed "residential" care. Instead, the difference is apparently indicated by the different parties to the agreements – TRMC and CMC. TRMC does not dispute, however, that one contract governed provision of acute care while the other governed provision of residential care.

B.      Alleged Violations of Active Treatment Regulations

Relators allege knowing violations of the active treatment regulations' "minimum" weekly

therapy requirements.[12]  As one example of knowing non-compliance, White, a therapist within the

Unit, testified that she was instructed by Kathryn Rawlings ("Rawlings"), Manager of the Unit, to

conduct "drive-by" therapy sessions.  White testified:

> I myself, was directed by [Rawlings] to do what was commonly known on the unit as
> a drive-by.  A drive-by session would – would take on a myriad of different looks.
> It would either be seeing a child for 10 or 15 minutes but documenting you spent an
> hour with them.  It would be a physician pulling a child out of a group session and
> seeing the child for five minutes and sending them back to group, and pulling out
> another child and doing the same thing repeatedly.  It would be a therapist making
> some kind of contact with the children on his or her caseload for a very brief period
> of time, if at all, but for a brief period of time to say, Hey, Johnny, how are you doing
> today, are you feeling suicidal, yes, no.  Are you taking your meds, okay, and
> document that they saw that child for the full [one hour] session.  That was a very
> common practice during that time. . . . I was directed to do it.  I was told to do it.  And
> I asked. [Rawlings] said, Just do a drive-by.  And I looked at her with an inquisitive
> look . . . [a]nd she said, Just see them for 10 or 15 minutes and say you saw them for
> an hour; you can't keep their attention that long anyway.

(White Dep., Ex. 17 to Pls.' Resp. to Def.'s Mot. for Summ. J., at 165-166.)  These "drive-by"

sessions, according to Relators, resulted in knowingly providing less than the "minimum" weekly

active treatment requirements set forth in Oklahoma regulations.  White reported drive-by sessions

to Rawlings' supervisor, Cynthia Koller ("Koller"), Director of the Unit, around November or

December 2004.  (*Id.* at 169.)  Relators have also submitted as evidence one of the Unit's written

policies, entitled "Therapist Performance Standards," which provides: "Therapists shall spend one

hour on each individual and family therapy session.  This can be broken down to 45 minutes with the

patient/family and 15 minutes to chart and discuss with nursing staff."  (Ex. 18 to Pls.' Resp. to Def.'s

---

[12]   Relators have abandoned other theories of regulatory violations advanced in their
Amended Complaint.

Mot. for Summ. J.)   According to Relators, this written policy also evidences knowing non-compliance with the active treatment requirements.[13]

    C.    <u>Billing Procedures</u>

During relevant times, TRMC billed Oklahoma Medicaid for services provided in the Unit by submitting electronic forms.  Prior to 2004, the form was a "UB92."  Sometime in 2004, the form changed to a "UB04."  Both forms are "Universal Billing" ("UB") forms published by the Centers for Medicare and Medicaid Services.   As explained by Deborah Spaeth ("Spaeth"), OHCA Behavioral Health Director, UB92 and UB04 forms are used for "bundled services," which means that several types of services are put together in one bill.  (Spaeth Dep., Ex. 8 to Pls.' Resp. to Def.'s Mot. for Summ. J., at 227-28.)  Two examples of such forms are attached as Exhibit 4 to Relators' Response to Defendant's Motion for Summary Judgment.  The examples provided by Relators are one-page documents that contain, *inter alia*, the following: (1) a statement of what dates the bill covers, *e.g.*, 12-26-03 through 12-31-03; (2) the provider number, *e.g.*, 100728750A (acute) or 100728750B (residential); and (3) a description of services, which includes the rate, beginning date of the service, and number of  "units" or days.[14]

Relators' first sample bill contains "Provider No. 100728750A"[15] and a description of services as follows:

---

[13]  For purposes of this motion, TRMC does not dispute that technical regulatory violations occurred.  These facts are included simply as examples of the types of regulatory violations at issue.

[14]  The bill contains other codes and descriptions that were not explained in either parties' statement of facts.

[15]  The "Provider No." is field 51 on these sample forms.

| 42 REV. CD. | 43 DESCRIPTION | 44 HCPCS/RATES | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | NON-COVERED CHARGES |
|---|---|---|---|---|---|---|
| 0124 | PSTAY / 2 BED | 652.00 | 121803 | 5 | 3260.00 | |
| 0259 | DRUGS / OTHER | | | 24 | 871.20 | |
| 0300 | LAB | | | 1 | 15.00 | |
| 0301 | LAB / CHEMISTRY | | | 4 | 359.00 | |
| 0305 | LAB / HEMOTOLOGY | | | 1 | 106.00 | |
| 0306 | LAB / BACT-MICRO | | | 1 | 102.00 | |
| 0307 | LAB / UROLOGY | | | 1 | 28.00 | |
| 0250 | PHARMACY | | | 87 | 394.00 | |
| 0001 | TOTAL CHARGES | | | | 5135.20 | |

Relators' second sample contains "Provider No. 100728750B" and a description of services as follows:

| 42 REV. CD. | 43 DESCRIPTION | 44 HCPCS/RATES | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | NON-COVERED CHARGES |
|---|---|---|---|---|---|---|
| 0124 | PSTAY / 2 BED | 425.00 | 122603 | 3 | 1275.00 | |
| 0124 | PSTAY / 2 BED | 425.00 | 122903 | 3 | 1275.00 | |
| 0259 | DRUGS / OTHER | | | 16 | 580.80 | |
| 0250 | PHARMACY | | | 58 | 328.00 | |
| 0001 | TOTAL CHARGES | | | | 3458.80 | |

These bills were both submitted for Patient 19. According to Relators, several other bills were also submitted for Patient 19 that constituted "false claims" because Patient 19 failed to receive the required weekly therapy hours.

As to when bills were generated and/or filed as claims with Oklahoma Medicaid, the evidence before the Court is less than clear. (*See, e.g.*, Mapp Dep., Ex. 4 to Def.'s Mot. for Summ. J., at 80-85.) There is no dispute, however, that it was not TRMC's practice to file claims every day, although

13

billing was on a per diem basis.  Instead, Barbara Mapp ("Mapp") testified that a bill was "generated" and a claim was filed for a particular patient upon "discharge."  A "discharge" can occur when a patient permanently leaves the facility, or when the patient's status is changed from acute to residential or vice versa.  Mapp also testified that she often "split" a bill, upon the patient's actual discharge, between periods authorized as acute care and periods authorized as residential care.  (*See* Mapp Dep., Ex. 4 to Def.'s Mot. for Summ. J., at 80 ("[W]hat we did was have to split the bill after discharge, after the bill is generated to match the authorization period.").  Sample claims provided by TRMC as part of its Exhibit 10 are difficult to understand in light of Mapp's testimony.  For Patient 48, three separate claims appear to have been generated and/or filed for a period of January 3, 2005 to January 27, 2005.  However, the three bills are at the same rate of $440.00/day, appearing to indicate that there was no change in status that would have prompted a "discharge" and resulting generation of new bill.  In any event, it is not disputed that some alleged "false claims" are UB forms submitted for time periods of less than one week, although the relevant patients ultimately stayed at the facility more than one week.

In her deposition, Rawlings was asked why the Unit billed Oklahoma Medicaid when it was not complying with the therapy requirements.  Rawlings testified that she did not believe that the active treatment requirements were relevant to billing Medicaid.  Instead, she viewed billing as being based on a "bed count" each night:

> It was my – it was my understanding that the way the . . . unit was billed was per bed day.  It was totally based on census.  It was totally based on a kid being in a bed at midnight on a particular night and then the Medicaid was billed the "x" amount of money.  The active treatment was a part of what we provided as a good quality of care.  It also did meet regulations, but I did not – those were two kind of separate things.  I didn't have anything to do with the billing mainly.  I was not responsible for the billing.  I didn't have anything to do with that.  I had to do with providing active treatment.

14

. . .

My understanding was that people were billed for bed days and active treatment was – it was our responsibility on the unit to provide active treatment.  Those were apples and oranges.

. . .

I've explained to you more than once how the billing was done.  It was done per bed date.  When the kids was in bed at midnight that night, there was a billing that occurred.

(Rawlings Dep., Ex. 12 to Pls.' Resp. to Def.'s Mot. for Summ. J., at 107-08, 123, 149.)  Thus, the

Unit manager admitted that she did not ensure that the active treatment requirements were satisfied

prior to billing Oklahoma Medicaid for any given patient.  She did not do so because she did not

believe it was necessary.

     D.    <u>OFMQ Audits</u>

     During the relevant time period, OHCA contracted with Oklahoma Foundation for Medical

Quality ("OFMQ") to conduct the "Inspection of Care Reviews" explained in § 317:30-5-95.2(6).

These reviews are known as a "retrospective audit" of the "prospective per diem" bills submitted to

Oklahoma Medicaid.  In her deposition, Spaeth explained a retrospective audit:

Q:     What does a retro audit mean?
A:     This means that I as a clinician have provided a service, billed and been paid for a service.  And then after the fact, someone is reviewing those documents to determine did I provide the appropriate treatment, did the patient actually meet the – the admissions criteria or medical necessity criteria for the level of care I was providing and being reimbursed for, did the service I get paid for actually get conducted, did I provide the appropriate documentation for the service following the policy in the guidelines.

(Spaeth Dep., Ex. 3 to Def.'s Mot. for Summ. J., at 70.)  When asked what the Inspection of Care

Team is "looking for," Spaeth responded:

[T]ypically what you see is a form that is – is designed by [OFMQ and OHCA], it's reviewed by the providers at the beginning of every year to determine that this type of document, yes, this format that we're looking at, kind of a checklist, is correctly going to review me as a provider to see that I'm meeting all of these different

> requirements in this set of regulations that I'm responsible to comply with.  And we
> do that every year with a provider because we want to make sure that they're clearly
> aware of what our contracted vendor is going to be looking at when we do those
> reviews.

(*Id.* at 123.)

On December 8-11, 2003, OFMQ conducted Inspection of Care Reviews of TRMC's acute

and residential programs and drafted a "Review Summary Report to the Oklahoma Health Care

Authority" ("2003 Audit").  (*See* Ex. 2 to Def's Mot. for Summ. J, at TRMC 2804-2818.)  On January

20, 2004, OFMQ sent a letter to Rawlings enclosing "deficiencies" identified by OFMQ for each type

of program (acute or residential) and notifying her of the reconsideration procedure.  (*Id.* at TRMC

2819.)  OFMQ issued final deficiency lists for the acute program (*see id.* at TRMC 2820-2844) and

the residential program (*see id.* at 2845-2871).  These deficiencies are summarized in charts entitled

"Disallowed Services Summary."  (*See id.* at TRMC 3190-3191 (residential), TRMC 3192-3193

(acute).)  Including both programs, TRMC was assessed a total of 448 partial per diem penalties

($50/day) and 2 full per diem recoupments.  These partial per diem penalties were assessed for, *inter*

*alia*, TRMC's failure to provide the required number of required weekly therapy hours for specific

patients.  The only two full per diem recoupments were assessed because the patient's medical record

did not contain an individual treatment plan.

On January 1-18, 2005, OFMQ conducted further Inspection of Care Reviews of TRMC's

acute and residential programs ("2005 Audit").  (*See* Ex. 3 to Def.'s Mot. for Summ. J.)  Following

the reconsideration period, OFMQ issued final deficiency lists in charts entitled "Disallowed Services

Summary."  (*See id.* at TRMC 2686-87 (acute), TRMC 2800 (residential).)  As a result of the 2005

Audit, OFMQ assessed 183 partial per diem penalties, which were assessed for, *inter alia*, TRMC's

16

failure to provide the required number of individual therapy hours for specific patients.   OFMQ did not assess any full per diem recoupments as a result of the 2005 Audit.

      E.      <u>Lundy Report</u>[16]

Warren Lundy ("Lundy"), a federal auditor, is the Manager of the Oklahoma City Field Office of the United States Department of Health and Human Services.   Lundy's role as an auditor is to "gather data and put in a format that [federal agents] can understand it."   (Lundy Dep., Ex. 7 to Pls.' Resp. to Def.'s Mot. for Summ. J., at 26.)   Lundy has not had training on the FCA and is not an attorney.   (*Id.*)

Lundy's audit staff "review[ed] patient files for 25 individuals and the associated Medicaid billings by [TRMC] during the period January 1, 2003 through April 30, 2005 to determine whether TRMC provided the required weekly therapy and treatment hours."   (Lundy Report, Ex. 5 to Pls.' Resp. to Def.'s Mot. for Summ. J., at 1.)   Lundy concluded that "[o]f the 140 weeks of service we reviewed for the 25 patients, TRMC did not provide the required 21 hours of therapy and treatment for 90 weeks (23 patients).   TRMC submitted 97 claims and received $198,355 from the Oklahoma Medicaid program for these weeks." (*Id.*)   These active treatment requirements are set forth in the following chart contained in Lundy's Report:

---

[16] TRMC moved in limine to exclude opinion testimony by Lundy, including those set forth in the Lundy Report. (*See* Doc. 267.) Such motion will be denied by separate order, which provides further information and background regarding the Lundy Report.

|  | Individual Treatment by Physician | Individual Therapy | Family Therapy | Process Group Therapy | Expressive Group Therapy | Group Rehabilitative Treatment | Individual Rehabilitative Treatment |
|---|---|---|---|---|---|---|---|
| Acute Care | 3 | *2* | *1* | *3* | *4* | *14* | 7 |
| Residential Care | 1 | *1* | *1* | 2 | 3 | *14* | 7 |
| Substitutions | | 1 for | 1 | 1 for | 1 | 2 for | 1 |

(*Id.* (emphasis added to columns Lundy added to reach total required hours.)[17]

Lundy explained his general methodology as follows:

*Since TRMC's billing cycle was not based on a seven-day week, we had to combine multiple claims to determine the length of stay (admission through discharge) for each patient.* We used the patient's admit date to determine the first day of a weekly stay. We did not analyze incomplete weeks of service (e.g. if a patient was in the facility for 25 days, we analyzed the first 21 days as three weeks of service and did not analyze the last four days). *In addition, we did not analyze weeks where there were not seven Medicaid payments.*
. . .

We reviewed the medical record documentation and charted the therapy and treatment sessions by time and date.   We used the following methodology to chart the information:

1) *charted a full hour session if the documentation had an incomplete or missing start or stop time*;
2) charted altered start or stop times;
3) charted sessions when the documentation did not include a provider signature;
4) charted group therapy sessions when either behavioral observations or outcome notes were missing;
5) charted available session time in both categories when the documentation indicated that sessions overlapped, giving precedence to the category that required the fewest hours per week;
6) *charted available session time when documentation indicated that the patient was not available for the entire session because the patient was*

---

[17]   Physician treatment hours are not at issue, and TRMC did not provide individual rehabilitative treatment.

> *out on pass, in restraints or seclusion, or visiting a doctor or other medical professional*; and
>
> 7) disregarded session time when documentation indicated the patient did not attend the session.
>
> We calculated the total number of therapy and treatment session hours for each week a patient was at the facility. *Additionally, because patients are sometimes in acute care and residential care status during the same week, we used the lesser residential care standard of 21 hours per week in our analysis.*

(*Id.* at 2-3 (emphasis added).)  Thus, Lundy erred on the side of caution in determining whether the required number of hours was 21 or 24, gave TRMC the benefit of the doubt where a patient's chart had a missing stop time, and attempted to account for occasions when the patient was not available to receive therapy.

Lundy then provided examples of TRMC failing to meet the "minimum" therapy hours for specific patients.  For example, as to Patient 19, Lundy concluded that "TRMC did not provide 21 hours of therapy and treatment for 33 of the 40 Medicaid weeks [the] patient was in the facility." (*Id.* at 4.)  Lundy then concluded that "[t]his resulted in 25 false claims" related to that patient, which are identified by claim number.  (*Id.*)  The Lundy Report proceeds in this manner for several other patients and therefore concludes that TRMC submitted numerous false claims.

## V. Overview of FCA

As a general matter, "[t]he FCA covers all fraudulent attempts to cause the government to pay out sums of money." *United States ex rel. Conner v. Salina Reg'l Health Ctr.*, 543 F.3d 1211, 1217 (10th Cir. 2008) (internal quotation omitted).  At relevant times, the FCA prohibited:

(1) knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the United States Government . . . a *false or fraudulent claim* for payment or approval; [and]
(2) knowingly mak[ing], us[ing], or caus[ing] to be made or used, *a false record or statement to get a false or fraudulent claim paid* or approved by the Government[.]

31 U.S.C. § 3729(a)(1),(2).

A.   General Elements

At relevant times, § 3729(a)(1) prohibited the presentation of false or fraudulent *claims* to the government for payment.  In order to establish a violation of § 3729(a)(1), "a plaintiff must show by a preponderance of the evidence that: (1) a false or fraudulent claim (2) is presented to the United States for payment or approval (3) with knowledge that the claim is false or fraudulent."  *United States ex rel. Trim v. McKean*, 31 F. Supp. 2d 1308, 1315 (W.D. Okla. 1998).  At relevant times, § 3729(a)(2) prohibited the making or using of false *records or statements* in attempt to get a false claim paid by the government.  *See Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 531 (10th Cir. 2000) ("Under § 3729(a)(2), liability is premised on the presentation of a false record or statement to get a false or fraudulent claim paid or approved.") (internal quotations omitted).  A relator may establish a violation of § 3729(a)(2) by showing:  "(1) a false record or statement (2) is used to cause the United States to pay or approve a fraudulent claim (3) with the defendant's knowledge of the falsity of the record or statement." *Trim*, 31 F. Supp. 2d at 1315.

B.   Types of Falsity

The Tenth Circuit has explained that the FCA "recognizes two types of actionable claims – factually false claims and legally false claims." *Conner*, 543 F.3d at 1217.  In a factually false case, "proving falsehood is relatively straightforward:  A relator must generally show that the payee has submitted an incorrect description of goods or services provided or a request for reimbursement for

20

goods or services never provided." *Id.* (internal quotation omitted).  In contrast, when the relator's claim is based on an alleged legal falsehood, "the relator must demonstrate that the defendant has certified compliance with a statute or regulation as a condition to government payment, yet knowingly failed to comply with such statute or regulation." *Id.* (internal quotation and alteration omitted).

Legally false certification claims "can rest on one of two theories – express false certification, and implied false certification." *Id.*  "An express false certification theory applies when a government payee falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." *Id.* (internal quotation omitted).  "This promise may be any false statement *that relates to a claim*, whether made through certifications on invoices or any other express means." *Id.* (emphasis added).  Express false certification claims are actionable under either § 3729(a)(1) or (2).  *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1168 (10th Cir. 2010).

In contrast, under an implied false certification theory, "courts do not look to the contractor's actual statements [in relation to a claim]; rather, the analysis focuses on the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment." *Conner*, 543 F.3d at 1217; *see also Lemmon*, 614 F.3d at 1170 (explaining that "implied-false-certification claims do not involve – let alone require – an explicit certification of regulatory compliance").  "[T]he key attribute of implied false certification claims – and what most clearly differentiates them from express-false-certification claims – is that the payee's request for payment lacked an express certification." *Lemmon*, 614 F.3d at 1169.  "[T]he pertinent inquiry for [implied false certification] claims is not whether a payee made an affirmative or express false

statement, but whether, through the act of submitting a claim, a payee knowingly and falsely implied that it was entitled to payment." *Id.* Implied false certification claims are only actionable under § 3729(a)(1), and not § 3729(a)(2), because an implied false certification theory "do[es] not require courts to examine a payee's statements to the government." *Id.* at 1168.

C.   Materiality Element

The Tenth Circuit has adopted a materiality requirement in cases involving express or implied false certification theories of FCA liability. *See Conner*, 543 F.3d at 1219; *see also Lemmon*, 614 F.3d at 1169 ("Though implied claims differ from express claims, they nonetheless share some common elements, including a materiality requirement."). In *Conner*, the Tenth Circuit declined to "address whether materiality is an element of the criminal false claims provision or under other theories of FCA liability." *Id.* at 1220 n.6. Therefore, the Tenth Circuit has not addressed whether materiality is a requirement in cases based on a theory of factual falsity.[18] Because the Court rejects Relators' factual falsity theory, it does not reach this question.

_____

[18] The majority position appears to be that materiality is a requirement in every civil FCA case. *See United States v. Southland Mgmt. Corp.*, 326 F.3d 668, 679 (5th Cir. 2003) (en banc) (Jones, J., concurring) ("There should no longer be any doubt that materiality is an element of a civil False Claims Act case. Our past precedent and every circuit that has addressed the issue have so concluded."); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999) ("Liability under the False Claims Act is subject to the further, judicially imposed requirement that the false statement or claim be material."); *United States ex rel. Oliver v. The Parsons Corp.*, 498 F. Supp. 2d 1260, 1288-89 (C.D. Cal. 2006) (collecting cases). However, where the allegation is a factually false claim, any "materiality" requirement would seem to be easily met in that the government paid a claim in a factually wrong amount, paid for a service that was not actually provided, or paid an amount greater than it should have based on the service actually provided. *See Conner*, 543 F.3d at 1223 ("[W]here the validity of actual costs is at issue, there can be little question that had the government known of the alleged fraud, it would not have made the payments.").

VI.     **Analysis**

In this case, Relators rely upon two alternative theories of falsity: (1) factual falsity on the face of the UB forms; and (2) legal falsity based on TRMC's implied false certification with Oklahoma Medicaid regulations.

A.     Factual Falsity Theory

Although they are merged in Relators' brief, Relators are asserting two theories of factual falsity that must be separately analyzed: (1) factual falsity flowing from use of one of the two different provider numbers (acute or residential) on the UB forms; and (2) the theory of factual falsity recognized in *United States v. NHC Health Care Corp.*, 163 F. Supp. 2d 1051 (W.D. Mo. 2001) [hereinafter *NHC*].  The Court easily rejects any theory of factual falsity premised on the "provider number" field of the UB forms.  Relators' theory tied to the provider numbers is simply that, by billing for acute or residential services while failing to comply with Oklahoma Medicaid's active treatment requirements for each type of service, TRMC submitted a "factually" false bill.  However, nothing on the claim forms, including the provider number, is "factually" false.  Relators do not contend, for example, that TRMC knowingly used the acute provider number for patients pre-authorized for residential care in order to receive a higher payment.  Nor have Relators presented any other facts indicating that the provider numbers were false on their face.  When correctly analyzed, Relators' "provider number" theory of factual falsity devolves to an implied false certification theory – namely, TRMC submitted false claims because it knowingly failed to comply with the active treatment regulations for each particular type of patient.  Therefore, the Court rejects any theory of factual falsity premised on the provider number field of the UB forms.

Relators also urge the Court to allow the case to proceed under a factual falsity theory adopted by the Western District of Missouri in *NHC*, a case involving (1) Medicaid services billed on a per diem basis, and (2) an alleged violation of a Medicare "quality of care" standard. In *NHC*, the United States alleged that a nursing home submitted false claims in connection with two residents. One resident suffered dehydration, digitoxicity, pressure sores, and other problems while in NHC's care, and the other suffered pressure sores, weight loss, and ultimately died in NHC's care. It was factually disputed whether these conditions were caused or worsened by NHC. Evidence in the record showed that, during the relevant time period, NHC experienced staffing shortages, NHC requested funding from its home office, several staff members quit due to ethical/workload concerns, and that the relevant state agency received numerous "hotline" calls regarding NHC's deficiencies. Relevant to relators' factual falsity theory, the court reasoned:

> Defendants are being sued because they allegedly failed to provide the services that they billed for. No certification, implied or otherwise, is necessary when the liability stems from the Defendants' activities of billing for procedures which they did not perform. This would plainly constitute fraud. The difficulty in proving that Defendants committed such a fraud lies in the per diem billing system utilized under Medicare/Medicaid. Obviously, if NHC billed the Government $4 for turning Resident 1 on July 18, 1998, but in fact no one actually performed the task, a clear cut case of fraudulent billing would be presented. However, we are not blessed with such pristine circumstances.[19] NHC billed the Medicare/Medicaid programs for the over-all care of each of these residents on a per diem basis. As previously stated by this Court, in so doing NHC agreed to provide "the quality of care which promotes the maintenance and the enhancement of the quality of life." *At some very blurry point, a provider of care can cease to maintain this standard by failing to perform the minimum necessary care activities required to promote the patient's quality of life.* When the provider reaches that point, and still presents claims for reimbursement to Medicare, the provider has simply committed fraud against the United States.

---

[19] As in *NHC*, this case does not present "pristine" circumstances because TRMC did not bill Medicaid separately for therapy sessions but instead "bundled" various services together in one bill.

Whether the Government has demonstrated that a factual dispute remains as to whether NHC crossed into this admittedly grey area, is the proper focus of this Order. . . .

While the Court concedes that this is an amorphous standard, it is not a standard without meaning. For instance, if a nursing home accepted a resident, provided absolutely no care to the resident, and then billed the Government for these non-performed services, it is quite clear that the nursing home would have committed fraud. *At some point the care rendered to a patient can be so lacking that the provider has simply failed to adhere to the standards it agreed to abide by and has thus committed a fraud.* Conversely, if the Government and NHC simply disagreed about what acts of care-giving were necessary to properly maintain a resident's quality of life, there would clearly be no fraud. *It is the Court's job in this Order to determine whether the Government has presented sufficient evidence to show that NHC's conduct might have fallen within that amorphous zone between fraud and simple disagreements as to proper care. It would then be the jury's function to determine which side NHC's conduct falls under.*

*NHC*, 163 F. Supp. 2d at 1055-56 & n.4 (internal citations and footnotes omitted) (emphasis and footnote added).  The court then analyzed the evidence, concluded that the United States had shown sufficient evidence of neglect to present a jury question as to falsity, and further concluded that the United States had created a question of fact as to the knowledge requirement.  The court held:

[A]n entity who is charging the Government for a minimum amount of care provided to its residents should question whether understaffing might lead to undercare. The knowledge of the answer to that question is charged to the Defendants when they submitted their Medicare and Medicaid claim forms. In other words, a jury could reasonably find that NHC should have known if they were failing to provide all necessary care to Residents 1 and 2 at the time they submitted their claims for reimbursement.

*Id.* at 1058.

In this case, Relators argue that TRMC requested reimbursement for services "never provided" because "the government expected the full provision of bundled services [including minimum weekly therapy requirements] as required by the Oklahoma Medicaid Regulations." (Pls.'

Resp. to Def.'s Mot. for Summ. J. 18.)[20]  Relators contend that their position is "stronger than the government's position in *NHC* because, in this case, [TRMC] was told by the government in clear and unambiguous terms exactly what the minimum requirements were. [TRMC] did not satisfy the minimum requirements for Active Treatment but billed the government anyway.  That is fraud." (Pls.' Resp. to Def.'s Mot. for Summ. J. 19.)  Relators further contend that this case does not involve any "amorphous" standard because the active treatment regulations, although contained within the "quality of care" regulations, create a bright-line minimum number of weekly therapy hours.  TRMC essentially argues that "quality of care" requirements, including the active treatment requirements, can only result in "factual" falsity if the overall bundled service is deemed "worthless."  *See Mikes v. Straus*, 274 F.3d 687, 703 (2d Cir. 2001) (explaining that a "worthless services" FCA theory of liability is "effectively derivative of an allegation that a claim is factually false because it seeks reimbursement for a service not provided" and that, in a worthless services FCA case, a plaintiff argues that "the performance of the service is so deficient that for all practical purposes it is the equivalent of *no performance at all*") (emphasis added).

The Court considered *NHC*, *Mikes*, and other commentaries addressing the proper approach to regulatory "quality of care" violations in cases involving bundled, per diem Medicaid bills. The

---

[20]   Relators do not allege that per diem billing occurred for children who were not actually present, which would present a more straight-forward "factual" falsity theory in the context of a per diem bill.  *See, e.g.*, *U.S. ex rel. Lacy v. New Horizons, Inc.*, 348 Fed. Appx. 421, 426 (10th Cir. 2009) (plaintiff alleged that defendant "billed the government for reimbursement at the per diem rate for days after patients died; when patients were absent from the facility and visiting with family; when a patient was in a hospital; and when a patient was moved out of state").  In *Lacy*, the claim was dismissed because the relator failed to provide specific information about dates, amounts, and which programs were overbilled. *Id.* Nonetheless, the allegations in *Lacy* exemplify facts that, if specifically alleged and proven, may support a case of "factual" falsity in conjunction with a per diem bill because the per diem services were literally "never provided."

26

Court agrees with the *NHC* court that there is a point between "worthless" and "negligent" at which a Medicaid claim can become factually false.  The Court holds that, in order to reach a jury on a factual falsity theory in the context of "bundled" per diem Medicaid billing, a plaintiff must present facts amounting to (1) the provision of entirely "worthless services," *see Mikes*, 274 F.3d at 703; or (2) at a minimum, the provision of grossly negligent services with regard to a particular standard of care or regulatory requirement, *see NHC*, 163 F. Supp. 2d at 1055-56 (adopting something akin to a gross negligence requirement in order to reach a jury on factual falsity theory in case involving quality of care); *see also* James E. Utterback, *Substituting an Iron Fist for the Invisible Hand: The False Claims Act and Nursing Home Quality of Care - A Legal and Economic Perspective*, 10 Quinnipac Health L. J. 113, 180 (2007) (concluding, in context of factual falsity and per diem Medicaid billing in nursing home context, that courts should "limit the applicability of the FCA to only those cases where the actions of the defendant are truly egregious, rising to the level of gross negligence in the provision of care").

Applying this standard here, Relators have failed to demonstrate the provision of worthless services or anything amounting to gross negligence with respect to the active treatment regulations at issue.  Of the examples provided in the Lundy Report, the worst example was Patient 19, who stayed in the facility for forty Medicaid weeks.  For this patient, during the most egregious week (week 33), TRMC still provided 9 of the 21 required therapy hours.  In total, TRMC provided 677.25 of the 840 required hours for Patient 19.  Therefore, even assuming the bundled Medicaid bills were exclusively for the provision of therapy (which they were not), TRMC provided well over fifty percent of the required therapy hours for the patient identified as suffering the most egregious violation.  No reasonable jury could conclude that TRMC billed Medicaid for worthless services

27

provided to Patient 19, and no reasonable jury could conclude that TRMC billed Medicaid for even "grossly negligent" services provided to Patient 19.  Instead, the evidence shows that Patient 19 received at least some of the care, including therapy hours, for which TRMC billed. In short, no reasonable jury could conclude that TRMC billed Medicaid for a "service not provided" by submitting the claims at issue.

Relators argue that gross negligence is also demonstrated by the frequency with which minor violations occurred.  Assuming frequent but less egregious violations could somehow support a finding that individual "claims" were false or fraudulent, which seems dubious, Relators have still presented insufficient evidence to support such a theory.  *See generally* Utterback, 10 Quinnipac Health L. J. at 156 (advocating gross negligence theory for widespread substandard quality issues only in cases severe enough to create what is known as an "immediate jeopardy" situation in the nursing home context).  Here, there is simply no evidence that the patients' overall "bundled" services were so deficient that a jury could conclude that any of the claims at issue were false on their face based on some type of widespread gross negligence theory.  Allowing this case to proceed on a factual falsity theory would stretch FCA "factual" falsity liability too far beyond its intended purpose of preventing misrepresentations of fact on claim forms.  In the Court's view, this case must be won or lost on an implied certification theory.

B.    Implied False Certification Theory

Unlike a factual falsity theory, the implied false certification theory contemplates knowing regulatory violations as a basis for false claims so long as the "underlying contracts, statutes, or regulations themselves . . . make compliance a prerequisite to the government's payment." *Conner*, 543 F.3d at 1218 (emphasis added).  "If a contractor knowingly violates such a condition while

attempting to collect renumeration, he may have submitted an impliedly false claim." *Id.* As explained above, materiality is an essential element of any implied false certification theory.

TRMC argues that it is entitled to summary judgment on Relators' implied certification theory because: (1) the Agreements do not condition government payment on compliance with the active treatment requirements, (2) the active treatment regulations themselves do not condition government payment on compliance because they are merely "conditions of participation" in the Oklahoma Medicaid program; (3) Relators have not created a question of fact as to the knowledge element; and (4) Relators have not created a question of fact as to the materiality element. The second and fourth arguments substantially overlap, *see Conner*, 533 F.3d at 1211 n.6 (explaining that "certification analysis is essentially a way to determine whether compliance was material to the government's decision to pay" and that the implied certification theory "essentially requires a materiality analysis"), but will be treated separately for consistency with the parties' briefs.

### 1.   Do Allegedly Violated Regulations Condition Payment on Compliance?

The Agreements do not make compliance with the active treatment requirements a condition of payment. In Article IV, entitled "Scope of Work," they provide that TRMC "*agrees* to comply" with all applicable Medicaid regulations, including the active treatment regulations. However, in a separate section of Article IV, which is specifically entitled "Payment," the Agreements state that TRMC "*certifies* that the services for which payment is billed . . . were medically indicated for the health of the patient and were rendered." These provisions, read together, indicate that TRMC generally agreed to comply with Medicaid regulations as a provider of Oklahoma Medicaid services but did not "certify" its compliance with all Medicaid regulations in relation to "services for which payment is billed." Instead, TRMC only "certified" that any particular service billed was medically

29

necessary and was actually rendered.[21]  Therefore, the Court must proceed to analyze whether the Oklahoma active treatment regulations themselves condition payment on compliance.

2.    Do Oklahoma Regulations Condition Payment on Compliance With Active Treatment Requirements?

In the Medicaid context, an allegedly violated regulation that is merely a "condition of participation" in the overall program cannot support an implied false certification claim.  *See Conner*, 543 F.3d at 1220; *see also Mikes*, 274 F.3d at 699-700 (explaining that the implied false certification theory "does not fit comfortably into the health care context because the [FCA] was not designed for use as a blunt instrument to enforce compliance with all medical regulations *but rather only those regulations that are a precondition to payment*").  Conditions of participation are generally "enforced through administrative mechanisms."  *Conner*, 543 F.3d at 1220.  Rather than a denial of payment as to any individual bill, the ultimate sanction for violation of conditions of participation is generally "removal from the government program."  *Id.*  Therefore, violation of a regulation that is merely a condition of participation would not, as a matter of law, be "material" to the government's decision to pay or not pay any individual claim.  *See id.* at 1219-20.  In contrast to a "condition of participation," a regulation that is a "condition of payment" can support an implied false certification claim.  The Tenth Circuit has liberally defined "[c]onditions of payment" as "those which, if the government knew they were not being followed, *might* cause it to actually refuse payment."  *Id.* at 1220 (emphasis added).[22]

_____

[21]  A "certification" to submit claims for only those services actually "rendered" is essentially a certification not to submit factually false claims, and the Court has already rejected this argument.

[22]  The Tenth Circuit's use of the word "might" indicates that "conditions of payment" are not limited to Medicaid regulations that, if violated, would certainly and in every instance cause the government to refuse payment.

In determining whether an underlying Medicaid regulation is a condition of participation or payment, the Tenth Circuit has not adopted a bright-line rule requiring that the regulation *expressly* condition payment on certification of compliance.  Instead, the Tenth Circuit stated in *Conner* that it would not "preclude the possibility that certain Medicare statutes or regulations might expressly or *implicitly* condition payment on certification of compliance under a false certification theory." *Conner*, 563 F.3d at 1222 (emphasis added).[23]

With this framework in mind, the Court turns to TRMC's argument that the active treatment regulations are merely "conditions of participation" in the Oklahoma Medicaid program.  The Court begins by explaining the decisions in *Conner* and *Mikes*, the two principal decisions relied upon by TRMC.  In *Conner*, the relator contended that a hospital's certification, in an annual cost report, that services identified therein "were provided in compliance" with the "laws and regulations regarding the provision of health care services" constituted an express false certification of compliance with all Medicare and Medicaid regulations.  *Id.* at 1218-19.  The court explained the relator's theory:

> Although this certification represents compliance with underlying laws and regulations, it contains only general sweeping language *and does not contain language stating that payment is conditioned on perfect compliance with any particular law or regulation. Nor does any underlying Medicare statute or regulation provide that payment is so conditioned.* Thus, by arguing that the certification's language is adequate to create an express false certification claim, Conner fundamentally contends that any failure by [the defendant] to comply with any underlying Medicare statute or regulation during the provision of any Medicare-reimbursable service renders this certification false, and the resulting payments fraudulent. Lest there be any doubt about the potential impact of this

---

[23]   The Second Circuit has adopted a stricter standard, requiring the underlying regulation to contain an *express* statement that compliance is required in order for that service to be compensable under Medicaid.  *See Mikes*, 274 F.3d at 700 (""[I]mplied false certification is appropriately applied only when the underlying statute or regulation upon which the plaintiff relies *expressly* states the provider must comply in order to be paid.").

proposed theory, Conner estimates that the United States has been damaged by [the defendant] in an amount exceeding $100,000,000 per year in reliance on allegedly false certifications.

*Id.* at 1219 (emphasis added). After explaining the difference between conditions of participation and conditions of payment, the court held that "the annual cost report certification does not condition the government's payment on perfect compliance with all underlying statutes and regulations, but rather seeks assurances that the provider continues to comply with the conditions of participation originally agreed upon" to become a participant in the Medicare program. *Id.* at 1220. *Conner* is helpful in distinguishing conditions of participation and payment but is otherwise of limited assistance. *Conner* involved an alleged express false certification in an annual cost report covering an entire year's worth of a hospital's services. This case involves "minimum" standards contained in regulations that are directly applicable to services bundled within the challenged Medicaid bills. Therefore, the *Conner* decision does not, as TRMC contends, end the Court's analysis.

In *Mikes*, which is more factually helpful, the court held that a Medicare statute stating that "no payment shall be made" for expenses that are "not reasonable and necessary for the diagnosis or treatment of illness or injury" was a condition of payment that supported an implied false certification claim. *See id.* at 700. In contrast, the court held that a Medicare statute stating – "it shall be the obligation" of a practitioner who provides a service "for which payment may be made" to assure compliance with a certain qualitative standard of care – was not a condition of payment. *See id.* at 701. Instead, the relevant administrative mechanism, which included a peer review process resulting in sanctions and corrective actions, indicated that the latter statute was merely a condition of *participation* in the Medicare program and not a condition of *payment* for the relevant medical service. *See id.* at 702 ("The fact that [the statute] permits sanctions for a failure to maintain an

32

appropriate standard of care only where a dereliction occurred in 'a substantial number of cases' or a violation was especially 'gross[ ] and flagrant[ ]' makes it evident that the section is directed at the provider's continued eligibility in the Medicare program, rather than any individual incident of noncompliance."). The court found that its differing treatment of these two statutes comported with Congress' purpose because a federal court is within its expertise in determining whether a procedure was "reasonable and necessary" but would be outside its area of competence in applying a "qualitative standard measuring the efficacy of those procedures." *Id.*

The Court concludes that the active treatment requirements are not merely conditions of participation for several reasons. First, they are not labeled as conditions of participation in either federal or Oklahoma law. As explained above, there are federal "conditions of participation" for hospitals providing psychiatric services, *see* 42 C.F.R. § § 482.60(a)-(d), and the federal "active treatment" requirements are set forth in a different section related to "requirements" for particular types of services. They are therefore not tied to eligibility for participation in the federal program. Admittedly, the Oklahoma regulatory scheme does not contain any "condition of participation" section. However, the Oklahoma regulation's use of the same phrase used in the federal regulation, "active treatment requirements," indicates that Oklahoma's active treatment requirements are also something other than a "condition of participation" in the program. *Cf. United States ex rel. Woodruff*, No. 05-00521, 2007 WL 1500275, at * 8 (D. Haw. May 21, 2007) (dismissing FCA claims brought under implied certification theory because regulations allegedly violated were expressly labeled in regulations or agreements as "conditions of participation").

Second, as explained above, the state regulation contains a "reimbursement" provision applicable to inpatient psychiatric services stating that the per diem rate is "inclusive" and covers "all

33

non-physician" services, including therapy conducted by mental health professionals.  TRMC is correct that (1) the reimbursement provision is contained in a separate subsection than the active treatment requirements, and (2) the active treatment requirements do not use the words "no payment shall be made unless" or other similar language described in *Mikes*.  Nonetheless, the Court finds that the reimbursement provision's language regarding the per diem rate covering "all non-physician services" is a sufficient link between compliance with the active treatment requirements and reimbursement.  *See United States ex. rel. Suter v. Nat'l Rehab Partners, Inc.*, No. 03-015, 2009 WL 3151099, at * 8-9 (D. Idaho Sept. 25, 2009) (denying summary judgment in case involving similar regulatory violations as those at issue here) (holding that sections of the "Medicare Provider Reimbursement Manual" requiring certain minutes of group therapy supported false claim based on implied false certification theory). Based on the Court's reading of *Conner* and *Mikes*, a condition of participation is one that is not tied to reimbursement in any way but is instead merely tied to continued eligibility in the program.

Third, the Inspection of Care Review process and regulations, contrary to TRMC's argument, do not mandate a finding that the active treatment requirements are conditions of participation. Although peer review processes and monitoring can certainly indicate that an underlying regulation is a condition of participation, the Inspection of Care Review process at issue here is directly tied to reimbursement.  Indeed, the goal of the review process is to determine if Oklahoma Medicaid is entitled to any refunds for deficient services.  The Inspection of Care Review regulation provides that "[p]enalties or non-compensable days which are the result of the facility's failure to appropriately provide and document the *services described herein* [including active treatment requirements], . . . *are not Medicaid compensable*."  Okla. Admin. Code § 317:30-5-95.2(6)(b).  The regulation says

nothing about an "ultimate sanction" of ineligibility for the program, *see Conner*, 543 F.3d at 1220 (explaining that "the ultimate sanction" for violation of conditions of participation is generally removal from the government program"), but instead contemplates partial and full refunds of money paid prospectively by Medicaid for services that are retrospectively deemed inadequate. *Cf. United States ex rel. Cooper v. Gentiva Health Servcs.*, Inc., No. 01-508, 2003 WL 22495607, at * 11 (W.D. Pa. Nov. 4, 2003) (rejecting implied false certification theory premised on a specific regulation because the regulation "makes abundantly clear that the proper redress for violations of the standards established therein is not the denial of payment, but the revocation of the supplier's billing privileges").

A careful reading of *Conner* and *Mikes* indicates that, for purposes of drawing a condition of participation/condition of payment distinction, the important issue is not the mere existence of *any* administrative review process related to a particular regulation, as argued by TRMC, but instead the purpose of such process.  If the process is designed to identify "flagrant" or "gross" violations that result in revocation of Medicare billing privileges, this may indicate that the underlying regulation is a condition of participation unrelated to individual payment decisions. *See Mikes*, 274 F.3d at 702 (statute permitting sanctions for only where violation was especially 'gross [] and flagrant[ ]' indicated that statute was "directed at the provider's continued eligibility in the Medicare program, rather than any individual incident of noncompliance").  Conversely, if the review process is focused on identifying "non-compensable" Medicaid days based on regulatory violations, as is the Inspection of Care Review process in this case, the process may indicate that the underlying regulations are not conditions of participation.

35

TRMC also relies upon *United States ex rel. Swan v. Covenant Care, Incorporated*, 279 F. Supp. 2d 1212, 1222 (C.D. Cal. 2002).  In *Swan*, the court rejected an *express* false certification claim because the defendant did not certify compliance with the relevant quality of care regulation as prerequisite to receipt of payment.  The court further reasoned that, under the federal scheme governing review of nursing homes, the Secretary of Health and Human Services "can impose a variety of sanctions on nursing homes for failure to meet quality of care guidelines," indicating that FCA was being used to turn a "discretionary denial of payment remedy into a mandatory penalty for failure to meet Medicaid requirements."  In contrast to the federal scheme governing review of nursing homes, the Inspection of Care Review process outlined in § 317:30-5-95.2(6) is limited to reviewing for Medicaid "compensability," and OFMQ's role is limited to assessing monetary penalties/recoupments for regulatory violations.  Thus, this is not case in which the reviewing body has discretionary authority to assess civil penalties, temporarily manage the facility, or ultimately terminate the right to participate in the program, such that allowing an FCA case would upset some larger administrative scheme.  Instead, imposing FCA liability seems consistent with the 2003 and 2005 Audits, so long as the deficiencies identified also rise to the level of false claims.

TRMC also contends that OFMQ's decisions following the 2003 and 2005 Audits to impose partial per diem penalties, rather than full per diem recoupments, shows that "the issues relating to the number of therapy sessions . . . have been addressed – through the administrative system – to the satisfaction of the State's Medicaid agency."  (Def.'s Mot. for Summ. J. 16.)  TRMC's argument seems to be that, because there were no full per diem recoupments assessed, payment could not have been "conditioned" on compliance with the minimum therapy hours.  This misses the thrust of the Tenth Circuit's definition of "condition of payment" as those regulations which, if the government

36

knew they were not being followed, "might cause it to actually refuse payment." *See Conner*, 543 F.3d at 1220. Here, the regulatory violation resulted in TRMC having to refund payments for certain patients. If such patients are at issue in this case, this could support Relators' theory that regulatory violations "might cause" a refusal of payment in the first instance.

The Court also agrees with Relators that the Inspection of Care Review process is not some type of "exclusive remedy" that is intended to foreclose FCA liability. The state's interest in reimbursement and the federal government's interest in punishing false claims are distinct, and these two remedies do not raise any sovereignty concerns. The aim of the Inspection of Care Review process is to identify deficiencies and obtain refunds. The aim of the FCA is to identify fraudulent claims and impose damages upon the offender for filing them. Further, as a policy matter, adoption of TRMC's "exclusive remedy" argument in the context of per diem billing would seem to invite false claims. A provider could knowingly violate numerous state regulations, bill Medicaid for the day, suffer a state-imposed penalty, but then avoid FCA liability.

Fourth, unlike other "quality of care" regulations such as those at issue in *Mikes*, the regulatory "minimum" standards at issue (although contained in the "quality of care" regulations) do not require application of any "qualitative standard measuring the efficacy" of the therapy provided. *Cf. Mikes*, 274 F.3d at 701-02 (reasoning that determining whether a physician's spirometry test was of a quality meeting "professionally recognized standards" would require the court to "step outside" its area of competence and "apply a qualitative standard measuring the efficacy of those procedures"). Instead, the active treatment requirements allegedly violated are objective and/or quantitative because they are simply weekly minimum therapy requirements. While TRMC may argue that "violations" of such weekly minimum therapy requirements necessarily occur due to temporary staffing shortages,

37

children's refusals, and other innocent reasons, this evidence goes to the existence of innocent or negligent violations versus "knowing" or "fraudulent" violations.  But the regulatory standard in this case is objective and does not present difficulties in application.  *Cf. Cooper,* 2003 WL 22495607, at * 11 (discussing court's inability to address the "quality" of services provided, *i.e.*, whether the physicians prescribed an improper or proper amount of "Flolan therapy").

Sixth, the Court rejects TRMC's contention that *weekly* therapy requirements cannot be considered conditions of payment because some alleged false "claims" bill Oklahoma Medicaid for less than a full week.  (*See* Def.'s Reply in Support of its Mot. for Summ. J. 7 ("[B]ecause Oklahoma Medicaid often only authorizes acute care in 5 day increments, and TRMC accordingly bills for such care in 5 day increments . . . if plaintiffs' theory were correct, then TRMC could not bill for a very large amount of the patient care it provides.").  Although this argument has visceral appeal, it is a red herring.  Based on Lundy's Report, Relators do not appear to be asserting that false claims were submitted for any patients receiving less than a full week's care, although the UB forms filed may reflect "split" bills for such patients.  There can be no regulatory violations, and therefore no implied false certification on a particular claim, unless the relevant regulatory condition was triggered, *i.e.*, for a patient staying more than a week.  In other words, if a provider impliedly falsely certifies compliance with a regulation, it only does so when the regulation is actually at issue for a particular claim.  At issue in this case are patients who stayed more than a week and whose bills were therefore subject to at least some minimum therapy requirements.  The billing procedures used by TRMC

necessarily complicate Relators' proof and jury presentation.  However, the Court rejects the premise that a regulation is only a "condition of payment" if it applies to every patient in the Unit.[24]

Finally, Relators have provided evidence from key individuals that the active treatment requirements were ones that "if the government knew they were not being followed, might [have] cause[d] it to actually refuse payment." *Conner*, 543 F.3d at 1220.  A federal official testified as to his belief that the "minimum" active treatment requirements were conditions of payment:

> Q:      Is there anything you're familiar with in the regulation or otherwise that says that the hours spelled out in this active treatment provision are conditions that you must meet to be paid by Medicaid?
> [Objections.]
> A:      My reading of this section of the regulation where it says they must provide this active treatment, and then active treatment is further defined by number of hours a service is provided per week, I take that as meaning they must provide those services, yes.
> Q:      And they need to comply with them 100 percent in order to bill the Medicaid system?
> A:      Yes. That's the way I would take – I take this, that they must provide these services.

(Lundy Dep., Ex. 7 to Pls.' Resp. to Def.'s Mot. for Summ. J., at 136-37.)  As the Behavioral and Mental Health Director of the OHCA, Spaeth testified as to her similar opinion:

> Q:      Is it . . . your testimony, the testimony of the agency, . . . that a provider may not bill Medicaid if they are short one hour of therapy for a residential patient?
> A:      Yes.  We would expect them not to bill for services that they didn't complete their requirements.

(Spaeth Dep., Ex. 8 to Pls.' Resp. to Def.'s Mot. for Summ. J., at 155.)  Eric Burch ("Burch") is the Chief Operating Officer of Ardent, Inc., which is TRMC's parent corporation.  Burch testified that he agreed with the following statement: "By billing Medicaid for a Medicaid patient treated in the

---

[24] Relators bear the burden, of course, of proving at trial that false "claims" were submitted, not merely that regulatory violations occurred.

unit but having failed to meet the required minimum weekly therapeutic hours for that patient, TRMC would be presenting a false claim to the government."  (Burch Dep., Ex. 10 to Pls.' Resp. to Def.'s Mot. for Summ. J., at 60.)  While obviously not controlling as to the legal distinction between conditions of participation and conditions of payment, these opinions are consistent with the Court's conclusion that the weekly therapy requirements, once triggered in a particular case, are not merely conditions of participation in the Oklahoma Medicaid program.

For all of the above reasons, TRMC is not entitled to summary judgment based on its contention that the active treatment regulations are, as a matter of law, merely conditions of participation that are not relevant to the government's decision to pay the claims at issue.[25]

### 3.  Knowledge

In the FCA, "[k]nowing" and "knowingly" mean "that a person, with respect to information – (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b).[26]  The statute provides that "no proof of specific intent to defraud is required."  *Id.* In the context of implied false certification, *i.e.*, legally fraudulent claims, the Tenth Circuit has indicated that the "knowledge" element turns on whether the underlying regulation was "knowingly" violated.  *Conner*, 543 F.3d at 1217, 1218 ("[I]n a claim based on an alleged legal falsehood, the

---

[25]  The Court has determined that the regulations are not conditions of participation.  In so doing, the Court did not find any inherent "ambiguities" in the regulations that would potentially invoke the "rule of lenity."  *See United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997) ("Even assuming that the FCA is penal, the rule of lenity is invoked only when the statutory language is ambiguous.").  Therefore, the Court also rejects TRMC's argument that "any ambiguity in the quality of care regulations should be construed in TRMC's favor, and the regulations should be interpreted to govern Medicaid participation, not payment."  (Def.'s Mot. for Summ. J. 18.)

[26]  This citation is to the statute as it was numbered prior to the 2009 amendments.

relator must demonstrate that the defendant has certified compliance with a statute or regulation as a condition to government payment, yet *knowingly* failed to comply with such statute or regulation.") ("If a contractor *knowingly* violates such a condition [regulation] while attempting to collect remuneration from the government, he may have submitted an impliedly false claim.").  Taking advantage of a disputed legal question in an underlying statute or regulation "is to be neither deliberately ignorant nor recklessly disregardful." *Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991) (holding that, where language of the Water Supply Act concerning allocation of costs among project purposes provided officials with wide discretion, an imprecise allocation based on disputed language of the statute did not constitute a "knowing" violation).

Relators have presented sufficient evidence to create a question of fact as to whether TRMC "knowingly" violated the minimum therapy requirements.  There is evidence that Rawlings instructed therapists to conduct drive-by sessions consisting of something less than the full hour and document them as full hour-long sessions.  If believed by the jury, this could be viewed as a "knowing" regulatory violation that resulted in an implied false or fraudulent certification of compliance upon submission of claims.  White was concerned about this practice of "drive by" sessions and reported it to Koller, Rawlings' supervisor.  There is also evidence that, around July 2005, TRMC was made aware, via an anonymous hotline call, that a therapist within the Unit was falsifying information about the length of therapy sessions he was providing to patients.  (*See* Ex. 21 to Pls.' Resp. to Def.'s Mot. for Summ. J. (memorandum of assignment for fact-finding report related to allegations).)  This led to an investigation and termination of such therapist, (*see* Burch Dep., Ex. 10 to Pls.' Resp. to Def.'s Mot. for Summ. J., at 77, 100-101), although the terminated therapist testified that he was simply doing as Rawlings instructed, (Young Dep., Ex.13 to Pls.' Resp. to Def.'s Mot. for Summ.

41

J., at 78).  As a final example, there is evidence of an official policy instituted by Rawlings that, according to testimony by a TRMC official, violates the regulations by instructing therapists to counsel for 45 minutes and chart for 15 minutes, rather than to counsel for the full hour.  While perhaps closer to "negligent" than the other two examples, this policy could be viewed as something akin to reckless disregard of TRMC's regulatory obligations.

These are but a few examples of Relators' evidence of "knowing" violations of the minimum therapy requirements, and the Court is satisfied that Relators have created a jury question.  *See Lemmon*, 614 F.3d at 1169 (holding, with respect to knowledge requirement in an implied certification case, that the relators had "explained how [the defendant] was aware of the violations, listing specific instances in which the [plaintiffs] documented and/or informed their superiors of the violations" and implying that, if proven, this would satisfy the FCA's knowledge requirement in an implied certification case); *Shaw*, 213 F.3d at 532 (upholding jury verdict where the defendant "knowingly" failed to practice silver recovery, which was required in its contract, but nevertheless invoiced for and accepted full payment under the contract); *Suter*, 2009 WL 3151099, at * 8-9 (denying summary judgment in case involving federal regulatory violations similar to those at issue here) (reasoning, with respect to knowledge, that evidence showed that defendant's employees understood the group therapy rules, knew they weren't being followed, but nonetheless submitted claims).

TRMC argues that, despite this evidence regarding a "knowing" regulatory violation, Relators cannot satisfy the "knowledge" requirement because Rawlings "did not believe it was improper to

bill for patients who may have missed some hours of therapy." (Def.'s Mot. for Summ. J. 19.)[27] However, Rawlings' testimony goes beyond confusion regarding whether the Unit could properly bill Medicaid in close cases, *i.e.*, providing some but not all of the minimum number of therapy hours. As explained *supra*, Rawlings believed that conducting a "bed count" was the only necessary step prior to billing Medicaid for the "bundled" services included within each bill. To her, compliance with minimum active treatment regulations and Medicaid billing were "apples and oranges."

Assuming this "bed count" evidence is relevant to the "knowledge" element in an implied false certification case, *see Conner*, at 1217-18 (indicating that "knowledge" requirement in implied false certification case goes to whether provider "knowingly" violated underlying regulation and then submitted an impliedly false claim, not whether provider understood that compliance was material to the government's payment decision), it certainly does not entitle TRMC to judgment as a matter of law. First, there is evidence that those in higher positions than Rawlings had a different view of TRMC's billing obligations. (*See* Burch Dep., Ex. 10 to Ex. 12 to Pls. Resp. to Def.'s Mot. for Summ. J., at 60.) Further, as argued by Relators, Rawlings' testimony could be viewed by a jury as an "ostrich with his head in the sand" approach to one's legal obligations before filing a claim. *See generally United States v. Krizek*, 111 F.3d 934, 942 (D.D.C. 1997) ("'This section is intended to reach the "ostrich-with-his-head-in-the-sand" problem where government contractors hide behind the fact they were not personally aware that such overcharges may have occurred.'") (quoting legislative history of FCA).

---

[27] This is not a case in which TRMC argues that the underlying regulation is somehow ambiguous. *See, e.g., Suter*, 2009 WL 3151099, at * 9 (explaining that "whether a defendant reasonably interpreted" the regulation allegedly violated is a relevant inquiry). TRMC contends that it is "ambiguous" whether the regulation was a condition of participation or was instead relevant to the government's payment decision.

TRMC's other argument in support of summary judgment is based on the "government knowledge inference," which "helps distinguish, in FCA cases, between the submission of a false claim and the knowing submission of a false claim – that is, between the presence and absence of scienter." *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 951 (10th Cir. 2008). "This inference arises when the government knows and approves of the facts underlying an allegedly false claim prior to presentment." *Id.* at 952. The Tenth Circuit has emphasized that "[i]t is only an inference" and that "it does not automatically preclude a finding of scienter." *Id.* "A classic example is when the government, with knowledge of the facts underlying an allegedly false claim, authorizes the contractor to make that claim." *Id.* Application of the principle "rests upon the depth of the government's knowledge of the facts underlying the allegedly false claim and the degree to which the government invites that claim." *Id.*; *see also Shaw*, 213 F.3d at 534 (government knowledge inference may arise "when the government's knowledge of or cooperation with a contractor's actions is so extensive that the contractor could not, as a matter of law, possess the requisite state of mind to be liable under the FCA").

Summary judgment may be warranted based on the government knowledge inference in certain limited situations. For example, in *Burlbaw*, the court affirmed summary judgment based on the government knowledge inference where the Department of Education incorrectly designated the defendant as a minority institution, and the defendant was subsequently invited by the Department of Defense to apply for set-aside contracts based on such designation. *Burlbaw*, 548 F.3d at 953. "With no reason to distrust the very agency responsible for administering the set-aside program, [the defendants] then relied upon the [Department of Defense's] assurances and invitations in certifying [the defendant] as a minority institution." *Id.* Further, "the undisputed evidence in the record

44

indicate[d] that [the defendant] was completely forthcoming with the [Department of Education] – the very agency on whose analysis the [Department of Defense] uncritically relied." *Id.*  In another example where summary judgment was proper, a relator argued that the defendant "falsified" test reports.  *See Shaw,* 213 F.3d at 534 (discussing *United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321, 327 (9th Cir.1995)).  The evidence showed that (1) the tests were the subject of discussion between the government and the defendant, and (2) the government knew of and expressly approved the testing method actually used.  *See Shaw,* 213 F.3d at 534 (discussing *Butler*).  In such case, the court concluded that the government and the defendant had "so completely cooperated and shared all information" that the only reasonable conclusion a jury could draw was that the defendant did not "knowingly" submit any false claims.  *Id.* (quoting *Butler*).

The 2003 and 2005 Audits reveal that the OHCA was at least generally aware of regulatory violations during the time frame of the alleged false claims.  TRMC argues that "[g]iven the outcome of these repeated audits – none of which resulted in OHCA instructing TRMC not to submit bills or threatening to decertify TRMC as a Medicaid provider, TRMC personnel reasonably concluded that the Unit's level of compliance with applicable standards was sufficient in regulators' eyes."  (Def.'s Mot. for Summ. J. 21.)  OFMQ's imposition of penalties for regulatory violations is not, in the Court's view, similar to the type of cooperation or acquiescence that has been held to entitle a defendant to summary judgment in FCA cases.  It must be remembered that OFMQ found "deficiencies," imposed partial per diem penalties for violations of, *inter alia*, the minimum therapy hour requirements at issue, and instructed TRMC to draft corrective action plans.  (*See* Exs. 22 and 23 to Pls.' Resp. to Def.'s Mot. for Summ. J.)  Imposition of a partial per diem penalty, as opposed to full per diem recoupment, does not constitute the type of government knowledge of regulatory non-

compliance that would entitle TRMC to summary judgment.  Therefore, TRMC is not entitled to judgment as a matter of law based on the government knowledge inference.

### 4.   Materiality

Pursuant to the most recent pronouncement of Tenth Circuit law, the materiality element "necessitates showing that the false certification was material to the government's decision to pay out moneys to the claimant."  *Lemmon*, 614 F.3d at 1169.  Thus, an express or implied false certification is actionable under the FCA "only if it leads the government to make a payment, which, absent the falsity, it *may* not have made."  *Id.* at 1170 (emphasis added).  The court further clarified that "materiality does not require a plaintiff to show conclusively that, were it aware of the falsity, the government would not have paid. Rather, it requires only a showing that the government *may* not have paid."  *Lemmon*, 614 F.3d at 1170 (emphasis added).  In support of these pronouncements, the *Lemmon* court cited *Conner*.  However, in *Conner*, the Tenth Circuit stated that "[a] false certification claim is only actionable under the FCA if it leads the government to make a payment which it *would* not otherwise have made."  *Conner*, 543 F.3d at 1219 (emphasis added).  The Court has attempted to reconcile these two materiality standards but cannot do so and will follow the more recent statement of law in *Lemmon*.[28]

As discussed *supra* Part II.B.2, the Court concludes that the active treatment regulations are not merely "conditions of participation" in the Oklahoma Medicaid program.  For the same reasons, the Court concludes that TRMC is not entitled to judgment as a matter of law based on Relators' inability to satisfy the materiality element.  As explained above, there is testimony in the record from

---

[28]   Other circuits have adopted a "natural tendency" materiality test, which inquires into whether the false statement has a natural tendency to influence or is capable of influencing the payment decision.  *See, e.g., United States v. Bourseau*, 531 F.3d 1159, 1171 (9th Cir. 2008).

Oklahoma and federal officials indicating that the minimum therapy hours were "material" to the government's decisions to pay the claims at issue.  In addition, the 2003 and 2005 Audits reveal that OHCA did in fact require TRMC to refund money based on certain regulatory deficiencies. Rather than indicating a lack of materiality, the 2003 and 2005 Audits could potentially support a conclusion that TRMC's implied false certification of compliance with the minimum therapy hours was "material" to OHCA's payment decisions regarding the bundled bills submitted by TRMC. Therefore, Relators have presented sufficient evidence to reach a jury on the question of materiality.

## VII.    Conclusion

Defendant's Motion for Summary Judgment (Docs. 230, 244) is DENIED.  The case will proceed to trial but only on an implied false certification theory.[29]  The pretrial conference scheduled for Monday, November 8, 2010, is rescheduled to Wednesday, November 10, 2010 at 2:00 pm.

**IT IS SO ORDERED this 5th day of November, 2010.**

_____

**TERENCE C. KERN**
**UNITED STATES DISTRICT JUDGE**

---

[29]   The Court has reviewed TRMC's Notice of Supplemental Authority (Doc. 334), which cites *United States ex rel. Steury v. Cardinal Health, Inc.*, 09-20718, 2010 WL 4276073 (5th Cir. Nov. 1, 2010).  The Court has considered and fully addressed authority similar to the *Steury* decision and does not believe any further discussion is warranted.